We'll hear argument next in number 21-1002, Truitt v. Salisbury Bank and Trust Company. And I know that the appellee is appearing remotely by Zoom, so he'll appear on the screen at the podium. But the appellant is here with us in person, so I'll call on Mr. Lower whenever you are ready. It's okay to take the mask off. Yes, that's fine. The policy is that you are allowed to take your mask off when you're speaking at the podium. Thank you. Do we have counsel for this? I counsel for the appellee is appearing by Zoom, so we'll come up on the screen. Here she goes. Mr. Lower, go ahead. In January of 2018, Salisbury offered Mr. Truitt a job, knowing he was a part-time citizen legislator. Mr. Truitt rapidly completed all of Salisbury's new mortgage loan originator training requirements and began meeting with clients. However, in April of 2018, when Mr. Truitt posted to Facebook announcing his campaign for New York Assembly District 106, another part-time citizen... The claim is that he was fired? That's correct. What evidence is there in the record that he was fired? The director of HR testifying that Mr. Truitt needed to choose between his campaign and his job. Is that firing him? No, that's discrimination in terms of employment. So you're saying he not necessarily is fired, but is otherwise discriminating because the statute says you cannot discharge or otherwise discriminate against somebody because of their outside political activity? Right. It's a one-count 201D allegation, so it doesn't particularly matter, but Mr. Truitt has not gone around town. We have this. I mean, the district court does say, and the appellee endorses the point, that undisputed evidence indicates that defendants merely presented plaintiff with a simple choice, continue his employment at the bank or pursue his campaign for the New York State Assembly, right? So they presented him with that choice. That's correct. So if we were faced with a religious discrimination case and the bank said, we think that employment at the bank is incompatible with the practice of Judaism, so you have a choice to either give up the practice of Judaism or end your employment at the bank. And then the employee responds by saying, well, if that's what you're going to say, I'm leaving. I don't think we'd ever say that he wasn't fired, that he quit voluntarily, would we? I don't think Mr. Truitt would tour the town identifying as someone who was fired at the beginning of a vibrant career for absolutely no reason. I mean, it's common for people to say that they resigned when they were actually fired. Well, when you say for absolutely no reason, would he have been able to perform both jobs? Yes. At the same time? Many New York State Assembly members do. And even with respect to the legislative calendar, it looks like there were 60 days when he'd have to be in Albany? I believe it was less than 60, by a small amount. That's not really an issue. When you say it's not really an issue, I'm asking a question about it. In my mind, it's an issue. Why would the requirement that he be in Albany for 60 days, or a little bit less, if you're right, I think the math shows that it's about 60, why would that not interfere with his ability to perform a job that requires 50 hours a week? Well, he lost the election, for starters. Those sessions tend to last approximately two hours. Salisbury provided Mr. Truitt with four weeks of vacation and personal time that he could use in partial day increments, which, even if there were 60 days per year, would have provided Mr. Truitt ample time to attend. Well, I guess you're saying that there's a factual dispute as to whether he could have been an Assembly member only outside of working hours. But I guess, before we even get to that question, I have the following question. So the statute says that you can't refuse to hire or discharge or discriminate against somebody for their political activities outside of working hours. So before he was fired, did Mr. Truitt, in fact, engage in political activity inside working hours? He never has. He never would have. So the bank instead was saying, well, you haven't engaged in political activity inside of working hours, but we think your political activity outside of working hours will lead you to become more engaged in political activity and then start working inside working hours. And so we're going to fire you now in anticipation of that involvement. Do you think the statute allows that? Absolutely not. Mr. Truitt could have been running for U.S. president, a position that I'll happily concede he could not simultaneously hold with his bank position. But it still would be unlawful to fire him for campaigning. That's correct. Because the statute defines political activities as running for public office. When they occur outside of working hours, off the employer's premises, and without the use of the employer's equipment or other property, all three of which are undisputed. Even if the bank were right that he couldn't perform the duties of an assembly member outside of working hours, it still was not allowed to fire him while he was campaigning, as long as he was campaigning outside of working hours. That's correct. That's absolutely correct. I don't see why you put it in terms of whether he could do the job of an assemblyman without interfering with working hours. The statute that you're relying on protects only an individual's political activities outside of working hours. And I don't see how it's disputable that the obligations to be in Albany attending to that number of days would interfere with working hours. But he wasn't fired because he was serving as an assemblyman. He was fired only for campaigning, and campaigning doesn't require that he interfere with working hours. So I just don't see why you put it in those terms about whether one can be an assemblyman and also do a different job. That's not what this case is about. This case is about his being – he was told that he couldn't campaign. He was told that he has to choose between campaigning for the assembly position and keeping his job, not that he has to choose between being an assemblyman and keeping his job. I agree entirely, Your Honor. I guess your point is that Judge LaValle is right about that. But your argument is that even if you could look to whether being an assemblyman was compatible with activities outside of working hours, you think given the number of vacation days and personal days that are afforded, he was compatible with working outside of business hours. It's also circumstantial evidence of discrimination in combination with their backdating of his termination date to the day before his employment benefits went into effect, and the fact that Mr. Truitt happened to be running against an individual who Salisbury's board of directors financially and politically supports, which is the reason he was told he was not going to be allowed to continue this campaign. I understand there's a dispute about that, but that can't – I mean, but even if that were not true, you would still say that it was an unlawful termination, right? We do respectfully dispute the existence of a dispute there. I mean, the April 27, 2018 meeting minutes from the board of directors has two D.D. Barrett financial supporters at that meeting in which they memorialized a decision to tell Mr. Truitt to decide between his campaign and his job. Well, you're saying it's not – it's not disputable that there were people who had contributed to his opponent, but whether that was the motivation for telling him that he couldn't continue his employment at the bank, that is disputed. Agreed, yeah. Those individuals were involved in discussing his campaign and whether or not it would be permitted. Mr. Bassin and Banta did not themselves fire Mr. Truitt. They were involved in the decision to proscribe his campaign. Okay, well, thank you, Mr. Lauer. You've reserved time for rebuttal, so we'll hear from you again. But let's turn to the appellee, Ms. Spataro. Thank you, Your Honor. So I would like to initially address the question of whether or not he was, in fact, going to be campaigning outside of working hours. At A102 to 104, it is undisputed that Mr. Truitt took four months off from his job to campaign his job subsequently. But that's after he left the bank, right? Yes. So if he had retained his employment at the bank, do we know that he would have campaigned within working hours? Yes. We just know that after he got a different job, he decided to take a leave of absence and do that. But if he had an employer that didn't allow that or that required him to work more hours, we just don't know what he would have done, right? We have evidence that the job as a mortgage loan officer from testimony from the two other mortgage loan officers that this was a 24-7 job. They were expected to be on call and that they worked on average – that is at A114, Your Honors. But your argument is not, in fact, that all mortgage loan officers are working 24 hours a day, seven days a week, is it? No, but my argument is that he was expected to put in abnormal hours, that he cannot just set aside hours and be unavailable, as per Ms. Burk's testimony. I'm sorry, so does that mean that it is impossible to be a mortgage loan officer at Salisbury Bank and ever engage in political activities outside of working hours because you're always on call and therefore there's no such thing as political activities outside of working hours? We believe not sufficient to run a state assembly campaign and the hours – so Mr. Bassin, in fact, testified that he – That is our contention, Your Honor, given our understanding and our business judgment and what our officers knew and understood to be the requirements of the position, not just – Well, can I ask you this question? Up until the point at which the bank told him that he had to choose between employment at the bank and campaigning for the assembly, had he, in fact, engaged in political activities during working hours? No, he had not. So, in fact, what you're saying is he announced that he was campaigning, and the bank said, well, okay, so far you haven't engaged in political activities inside of working hours, but we think you will in the future, and therefore in anticipation of you getting more involved in the political activities, we're going to terminate you now. We never said that, Your Honor, and there's actually no evidence of that. What we said was we asked him – we said if you can keep your job, and as he said at A639 in his own testimony, he was not going to be terminated. And the court also acknowledged this. The district court at – The undisputed evidence indicates that defendants merely presented plaintiff with a simple choice, continue his employment at the bank or pursue his campaign for the New York State Assembly. So the bank was saying that if you continue to campaign, you'd be fired. If he decided to elect to campaign, because you're right, Your Honor. He had not done anything yet. So if he had decided to start a campaign – Correct. So the statute says you can't discriminate against somebody because of the individual's political activities outside of working hours. So at the time you put him to this choice, the only political activity in which he had engaged was outside of working hours. So didn't you do exactly what the statute prohibits you from doing? No. We asked him to tell us of his intention, whether he intended to move forward with the campaign or whether or not he wished to continue the employment, because we believe the enormous time commitment resulting from this, irrespective of whether it was political activity or whether it was – But you didn't say to him – but the bank didn't say to him, can you do this solely outside of working hours? The bank didn't put that proposition to him. The bank simply said, you've got to choose between a campaign or the job. They did, Your Honor. Actually, it's in his deposition testimony. We did discuss with him, and he acknowledges it, as does Mr. Cantil. They both discussed it in their depositions. They discussed when he would do this, how he would find the time to do this. He insisted he could do both. We told him we didn't think he could do both. There was a lot of discussion on both April 13th and then subsequently on April 24th. But he responded that he could do both. It was his belief, but he had no experience being a mortgage loan officer. He was a 22-year-old right out of school. Why wouldn't it have been – why wouldn't the proper thing been to say, OK, the statute permits this so long as you don't interfere with working hours, so we'll go ahead. But if your campaign treads on working hours, that will be the end of your job. The reason was we were trying to break into a new market, so we needed boots on the ground. We needed someone to be available. We needed someone to be responsive. We were trying to develop that new market. That's in Mr. Cantil's declaration. And so this was a very important new market for the bank, and we needed him to put the time, the effort, the hours. It was going to take a lot of time to start this up. So we made this assessment and this business decision that we couldn't have him devoting the ample time and effort that he ultimately did wind up devoting to the state assembly. Assuming he was fired, was he fired because he wouldn't be able to do both jobs or because he was campaigning? I'm a little unclear. He was fired because of the enormous time commitment that was going to be required of him to both campaign and commit to this other position that he was choosing to apply for. So, for example, if he had said, well, what is there? What is there? What is there in the record about the time commitment of campaigning? There is discussions, I believe, in Mr. Cantil's deposition testimony and his declaration. There are many. So we also there's evidence in the record that we have multiple people at the bank who are also in various legislatures, not not at the state level, but also at the local level. As was Mr. Truitt. We knew when we hired him that he was a local Dutchess County legislator. So we had no issues with his political activity at the local level. But we'd also had previous experience. So you don't dispute that the law prohibits you from telling somebody an employee you are working on a political campaign outside of business hours and we don't like that. So we're going to fire you. Right. That is agreed. You couldn't do that. That is correct, Your Honor. So if, in fact, what you said to an employee is, well, so far you've only been working on a campaign outside of working hours, but we think you're getting really involved in this campaign. And we think you're going to start devoting more time to it than you say you are at this point. We think that's going to interfere with your job responsibilities in the future. So, therefore, we're going to terminate you now. You think that's allowed under the statute? Your Honor, we were not going to terminate him right then and there. I think that is a fallacy. That is that plaintiff is. So when you put him to the choice of when you put him to the choice of working at the bank or campaigning for the assembly, when would you have fired him? So we have this letter from him, right? You put him to that choice. That's his letter. Nobody in our end says that. There's no evidence that we're going to fire him. But your end said that you have to choose between campaigning and having the job. The fair inference of your position is if you continue henceforth from now on, if you continue the campaign, that's the end of your job. Isn't that what the bank's position was? So you cannot keep this job if you're going to keep campaigning. So we believe that the time commitment is incompatible, and our contention is that running for political office, like anything else, is not sacrosanct. It is an outside position. Just like if he said, I am going to start fundraising, which is also protected under the statute, for abortion, whether it be rights or against it. It doesn't matter. If that starts interfering with your job and creates a conflict of interest, we are allowed to take action. Can I ask you what in the record indicates that this started interfering with his job? You just said a moment ago that he had not yet done anything during working hours. Your Honor, you're correct. You're correct, but that's where we say this was a resignation. We didn't fire him. He chose to leave. We never got to that point. So my understanding of the record is you said to him you can either work at the bank or campaign for the assembly. Then he responded by saying, well, you're putting me to this choice. I'm not going to stop campaigning for the assembly. And that's the point at which he was terminated or his position was no longer tenable, right? Once he made the choice to campaign, would he – so if he had responded and said, well, I'm going to continue campaigning, but I'm also going to continue working at the bank, would you have let him show up to work the next day and keep giving him a paycheck? Yes, Your Honor. We would have. He never showed up for work on the first. Wait, so when you said you must choose between working at the bank or campaigning, you in fact were not putting him to that choice. You're saying he could have kept campaigning and kept showing up to work and kept getting a paycheck. And then you're right. We would have had to decision to make. You're right. We would have had to. You're saying that the proposition that you have to choose between the one and the other was a lie. You're saying you were lying to him because you really would have continued him in the job notwithstanding the campaign as long as – I think at some point we would have had a decision to make, but he resigned before we got to that point. He – we found out about this outside activity, and pursuant to our outside activity policy, we assessed it. We said, we don't think you can do both. We think it's a conflict of interest, just like any other outside. We came to him and said, we don't approve of you doing this. You're going to have to choose between doing this and continuing your employment. And he said, I'm choosing to resign. He didn't say – he actually didn't say that, right? So the letter says, I'm truly saddened to say that after multiple discussions with Doug Cahill and after meeting with Rick Cantelli yesterday, it has been confirmed to me that my employment with Salisbury Bank will not be continued if I pursue election to the New York State Assembly this November. So why didn't you respond to that by saying, well, actually you can pursue election and continue your employment in the bank. That's a misunderstanding. He never came out to work. He never – he sent that letter in and he didn't show up to work the next day. But because – You didn't know how to reach him? So – You didn't know how to reach him? He said, if I continue. And he said, I'm not giving up this opportunity if you continue the letter. He said, I'm pursuing that. And we said, OK. It doesn't matter whether he was fired or not because putting to him the proposition, putting to him the proposition that regardless of whether you trespass on working hours, you cannot keep the – you cannot keep campaigning and also keep the job. You told him he has to choose between them. So it doesn't matter whether he was fired. I mean being – if he was fired, that helps his case a little bit. I mean it helps. It's something that's on his side. But it's not essential to him. You're putting to him the proposition that if you spend five minutes campaigning, that's incompatible with your keeping your job and you can't do both. That's something that the statute forbids. But, Your Honor, I don't think it's sacrosanct. I don't think the statute intended to let him campaign as Mr. Lauer conceded for president at the detriment of his job. And as you said, outside of working hours where he doesn't have a nine-to-five job. It's not clear what his working hours are. And we did not believe in our business judgment that he could meet the responsibilities of this job and campaign for state legislature that in and of itself is an $80,000-a-year job. It's a full-time job. We made a business judgment that these two things were incompatible. And as we said, we knew he was a Dutchess County legislator, so we don't have any animus towards political activity generally. It was the commitment related to this particular job that we believed was incompatible with the needs of the mortgage loan originator position in this brand-new market we were trying to develop. Okay, Ms. McHale. I think we have that argument. Thank you for your argument. We'll turn back to Mr. Lauer on rebuttal. Thank you, Your Honors. What we've heard here today is a series of business judgment-based reasons for violating the law. The law does not take into consideration business considerations, profit margins, anything of that nature. Well, it does take into consideration whether somebody is engaging in political activity during working hours or using the resources of the employer, right? Absolutely, Your Honor. But Mr. Truitt had not done that at the time that he was put to the choice between his job and campaigning. And that's uncontested. Also, appellees indicated they were not going to terminate Mr. Truitt right then, meaning May 1. I mean, respectfully, page 339 of the appendix has the testimony of Salisbury's director of HR, in which case he acknowledges he told Mr. Truitt that he needed to make a decision between his job and his political campaign by Tuesday. That was on April 27, 2018, which would make Tuesday May 1, 2018, the day Mr. Truitt was fired, which is just four days after the financial supporters of Mr. Truitt's opponent met and decided to create this ultimatum. Now, your adversary says that there were discussions about the ability to do the job, about his ability to do the job without trespassing on working time. And does the record show that he took a position as to whether he could do the campaign without trespassing on working time? Yeah, it never – he was campaigning. It never interfered with his working time. No, as to what he said in the discussions, did he say that he could do the campaign without interfering with working hours? Absolutely, as well as this part-time citizen legislature job. What about the evidence that he took a four-month leave of absence to campaign after he left the bank? Sure. So he took about a $100,000 pay cut to abandon his career that he went to school for. He's got a disparaged reputation in the industry. And he went to work for a construction company in the neighborhood of $50,000 a year. His employer, during a portion of the season that wasn't tremendously busy, suggested that Mr. Truitt take the time off to focus on his campaign. So if Mr. Truitt had stayed working at the bank, would he have taken a four-month leave of absence to campaign? Under no circumstance, and that is consistent throughout the record. Meaning as far as what Mr. Truitt testified to and everything that we've represented throughout this entire case. With respect to the 24-7 on-the-job requirement, I mean, this is a false representation that we already responded to in our reply at 13. And I see that – You can just wrap up. Okay. Ultimately, as the panel seems to have formed on its own, the distinction between termination and mere discrimination in the workplace is not really necessary to find a violation of Labor Law Section 201D. And the mere temporal proximity between this ultimatum and Mr. Truitt's termination is something that this circuit has already addressed. Specifically, Judge Roman was overturned by this circuit for failing to conclude that three weeks between protected activity and termination was insufficient to make a prima facie showing of causation. Accordingly, I think this record provides much stronger support than that opinion in Yang v. Navigator's group. I thank the panel for its time and consideration. Thank you very much, Mr. Lauer. The case is submitted.